# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MASSACHUSETTS
# EASTERN DIVISION

| | |
|---|---|
| In re<br><br>ZAW M. AUNG,<br><br>        **Debtor**<br><br>ATLANTIC TRADE LLP and<br>MOHSEN GHORBANI<br><br>        **Plaintiffs**<br><br>v.<br><br>ZAW M. AUNG,<br><br>        **Defendant** | Chapter 13<br>Case No. 18-10781-FJB<br><br><br><br><br>Adversary Proceeding<br>No. 18-1071 |

## **MEMORANDUM OF DECISION**

By the sole remaining count in this adversary proceeding, the plaintiffs seek a determination that a judgment debt owed them by the defendant and chapter 13 debtor, Zaw M. Aung, is excepted from discharge in this bankruptcy case by operation of Bankruptcy Code § 523(a)(2)(A). After a trial on this count, I now enter the following findings of fact and conclusions of law under Fed. R. Civ. P. 52(a)(1), made applicable by Fed. R. Bankr. P. 7052.

**PROCEDURAL HISTORY**

On March 6, 2018, Zaw Aung ("Aung") filed a petition for relief under chapter 13 of the Bankruptcy Code. In the bankruptcy case thereby commenced, Mohsen Ghorbani ("Ghorbani") and Atlantic Trade LLP ("Atlantic Trade") (together, "the Plaintiffs") jointly filed the complaint commencing the present adversary proceeding. It seeks relief in four counts. By an earlier order, the Court dismissed Counts III and IV for failure to state a claim on which relief could be granted. In the two remaining

counts, the Plaintiffs seek a determination that Aung's judgment debt is excepted from the discharge that Aung seeks in this chapter 13 case: in Count I, under 11 U.S.C. § 523(a)(2)(A); and in Count II, under § 523(a)(4).[1] The Court held a trial on these counts. The parties then submitted proposed findings and conclusions, after which the Court heard closing arguments. In neither their proposed conclusions nor their closing arguments did the Plaintiffs seek conclusions or demand relief under § 523(a)(4); during closing arguments, their attorney clarified that they now seek relief solely under § 523(a)(2)(A). They have thus waived their reliance on Count II. Only Count I remains to decide.

In Count I, the Plaintiffs contend that their judgment against Aung is one for money obtained by false pretenses, a false representation, and actual fraud. The gravamen of this count is that by some combination of false representations and false pretenses, Aung represented and otherwise led the Plaintiffs to believe that he owned three sushi businesses that he was offering for sale to the Plaintiffs, that they relied on these representations and were justified in doing so, and in reliance thereon the Plaintiffs paid Aung $90,000 for his interests in the businesses, but that Aung in fact had no interests in the businesses in question. Aung contends that his role was always that of a mere broker and that he never represented or led the Plaintiffs to believe that the rights he was selling were his own.

**FINDINGS OF FACT**

The parties agreed to the introduction of thirteen exhibits and offered the testimony of only two witnesses, Ghorbani and Aung. The stories told by the two witnesses were widely divergent. I found Ghorbani to be credible and Aung not.  My findings of fact are as follow.

1. In 2009, Ghorbani was a real estate agent living in Mashpee, Massachusetts, on Cape Cod. In the course of his work, he met Thwe Nu Aye, a/k/a Caroline ("Caroline"), when she responded to an ad that he had placed for a unit for rent, a winter rental. He showed her a unit and arranged for her

---

[1] In a chapter 13 case, the debtor receives a discharge, if at all, only upon completion of payments on a confirmed plan.  To date, Aung has not obtained confirmation of a plan, and completion of a confirmed plan remains at best years away.

2

to rent it. They became friends. After this winter rental expired, Caroline lived for a time with Ghorbani, including during the months of November and December 2010.

2. Caroline told Ghorbani that she was the owner of and sushi chef at the sushi bars in two Stop & Shop supermarkets, in Falmouth and Mashpee, Massachusetts. Ghorbani and his wife enjoyed sushi, frequented Caroline's sushi bars, and enjoyed what she served up. In 2010, Caroline asked Ghorbani to become a partner in her sushi preparation business; she would handle the operations, and he would be a "silent partner." Ghorbani agreed, and for that purpose they established Atlantic Trade, LLP ("Atlantic Trade") as their sushi preparation partnership. Caroline, the "operations partner," ran the two sushi counters.

3. Later in 2010, Caroline suggested to Ghorbani that they expand the business, and to that end, she introduced Ghorbani to Aung. Ghorbani testified, and I find, that Caroline[2] told Ghorbani at this time that Aung "has" a sushi business at the Roche Brothers supermarket in Mashpee "that he wants to sell." They reasoned that Atlantic Trade would then control all the supermarket sushi bars in the Mashpee and Falmouth area and have the entire market to itself, without competition.

4. I find that as of this time, Caroline had an existing relationship with Aung. Aung's testimony that he had no prior knowledge of or relationship to Caroline, and that he met her for the first time only when or after Ghorbani first approached Aung about acquiring the sushi concession in the Mashpee Roche Brothers, is not credible.

5. Aung did not then or ever have an ownership interest in the sushi bar in the Mashpee Roche Brothers or in any sushi bar in any store. When he met Ghorbani in November 2010, he was employed as a sushi chef for Lwin Family Co., d/b/a Hissho Sushi ("Hissho"), which operated the sushi

---

[2] Caroline did not testify or otherwise appear at the trial. Both parties stated that they did not know her whereabouts.

bar at the Roche Brothers in Mashpee and employed Aung as the sushi chef at that sushi bar (and that one only).

6. After meeting Aung at the Roche Brothers Mashpee store, Aung met with Ghorbani at Ghorbani's home in November 2010. Ghorbani testified credibly, and I find, that at that meeting, Aung held himself out to be the owner and operator of three sushi bars, the one at the Roche Brothers in Mashpee and two others elsewhere, which he was willing to sell. Aung denied that he ever represented to Ghorbani that he owned any of the sushi bars in issue; this denial is not credible, contradicted as it is by several documents that Aung later signed that identified him as the owner and seller of the three sushi bars in issue.

7. Aung then offered to sell the Mashpee location to Atlantic Trade. They negotiated and agreed on a purchase price of $15,000.

8. Aung testified that he never told or lead Ghorbani to believe that he owned an interest in the Mashpee sushi bar and that he did not offer to sell such an interest to Ghorbani. Rather, he testified, he offered to act as a broker between Ghorbani and Hissho. (It is undisputed that the right to operate a sushi bar at the Roche Brothers in Mashpee belonged to Hissho.) For several reasons, this testimony is not credible. Ghorbani had never before served as a broker with Hissho; he did not know and, even in conjunction with this transaction with Ghorbani, does not purport to have ever communicated with anyone at Hissho senior to his own immediate supervisor at the Mashpee store; in Exhibit 1 (discussed below), he represented in writing that he was the "seller" of rights as to the Mashpee sushi bar and agreed and promised to sell that interest to Atlantic Trade; and, though he contends that a broker was necessary to help a prospective operator to obtain the franchise rights as to a high volume sushi bar, such as the one in the Roche Brothers in Wellesley, even he does not contend that a broker would have served any purpose in helping Atlantic Trade obtain from Hissho an interest in the Mashpee location.

4

9. After Aung made his offer and the parties agreed on a price, Ghorbani himself (not through counsel) drafted a one-page document entitled "Bill of Sale 1" that he testified, and I find, reflected their agreement. Despite its title, it is not a bill of sale (a record of a transaction that has already occurred) but the memorialization of a purchase and sale agreement. It states (in its entirety):

> This contract is made this 13 day of November 2010 between: Buyer: Atlantic Trade LLP Representing (sic) by Mr. Mohsen Ghorbani and Mr. Zaw Mow Aung as seller.
>
> The seller is selling the %100 (sic) interest in sushi counter that is located at the Roche Brothers Supermarket Inc located at: 11 Commercial Street Mashpee, MA 02649-3481 for amount of $15,000.00.
>
> The buyer will pay the seller the amount of $5000.00 on or before 11/15/2010 as a deposit and balance of $10,000.00 after the contract has been drafted and assigned by the Hissho Company Management the direct representative of Roche Brothers Supermarket Company acknowledge Atlantic Trade LLP as the new owner/vendor/contractor.  The date of the above contract assignment has to be on or before November 28, 2010.
>
> If this deal was (sic) not able to go through the seller must return the deposit %100 to Atlantic Trade LLP A.S.A.P.  Also, if this deal did not go through by the fault of the seller the selling (sic) is assuming all responsibility to refund any and all expenses that was invested by Atlantic Trade LLP  and it's (sic) representative for this contract (travel expenses in all and any and all other fees in this matter) This is (sic) initial investment is (sic) been made directly and solely by Mr. Moshen Ghorbani.

10. In Bill of Sale 1, the above text is followed by four signature lines:

> Buyer:  Atlantic Trade LLP: by Mohsen Ghorbani
>
> Seller: Mr. Zaw Moe Aung
>
> Witness: Mr. Ray Amounzandeh
>
> Witness: Thew Aye [Caroline]

11. The named signatories signed Bill of Sale 1 on November 13, 2010 in their respective capacities. Aung signed for himself, and Ghorbani signed on behalf of Atlantic Trade. Caroline and Ray Amounzandeh (a friend of Ghorbani who happened to be staying with Ghorbani at the time) signed as witnesses.

5

12. In signing Bill of Sale 1, Ghorbani understood that he was purchasing a right to operate that belonged to Aung, and that, although he would also need for Hissho to acknowledge Atlantic Trade LLP as the new owner/vendor/contractor, he needed to purchase Aung's right to operate the Mashpee sushi bar in order to become its new operator.

13. By two checks, Ghorbani paid to Aung the $15,000 required by this agreement

14. By signing the agreement, Aung made two representations to Ghorbani: that he owned rights as an owner, vendor, contractor, or franchisee as to the Mashpee sushi bar; and, by his promise to sell the same to Atlantic Trade, that he intended to transfer rights as an owner, vendor, contractor, or franchisee of the Mashpee sushi bar to Atlantic Trade. Both representations were false. Aung knew them to be false when he made them, and he made them with intent to induce Ghorbani, as a principal of Atlantic Trade, to rely on them by paying him $15,000 for the rights he purported to be selling.

15. Aung testified that he did not read Bill of Sale 1 before signing it, suggesting that he did not know that by signing it he was purporting to be an owner of rights and promising to sell the same. This testimony is not credible. Bill of Sale 1 is neither lengthy nor complex. The language of purchase and sale appears prominently in several places, including its title. Even to simply find his signature line Aung would have had to see that he is identified on that line as a seller. Aung, who is a 1994 immigrant from Burma/Myanmar, speaks English with a very heavy accent, but his testimony made clear that he understands and reads English competently. I am satisfied that he did not fail to understand that he was purporting to be an owner of rights and promising to sell the same.

16. In the alternative, Aung testified that when he saw that Ghorbani was characterizing their agreement as a purchase and sale of rights belonging to Aung, Aung explained to him that this was false and that Ghorbani was acting simply as a broker, a go-between. This testimony, too, is not credible. Ghorbani, an experienced real estate broker, would not have paid to purchase rights from Aung that Aung did not own and could not convey.

6

17. Ghorbani and Atlantic Trade relied on these false representations by paying $15,000 to Aung. This reliance was justified, as Ghorbani knew of no reason to believe otherwise; he was aware of no red flag.

18. Had Ghorbani known that Aung had no rights as an owner, vendor, contractor, or franchisee as to the Mashpee sushi bar, he would not have entered into the agreement embodied in Bill of Sale 1 or paid Aung its $15,000 purchase price. For this payment he received in fact nothing, as Aung did not own what he purported to convey. Ghorbani was injured by loss of the $15,000 paid.

19. Ghorbani testified, and I find, that soon after Ghorbani paid Aung $15,000 for the Mashpee sushi bar, Aung approached him and offered to sell Atlantic Trade two other sushi bars that he claimed to own and operate, at Roche Brothers stores in Quincy and Wellesley, Massachusetts.

20. Aung's representation to Ghorbani that he was the owner and operator of the sushi bars in these stores was false. Aung held no rights as an owner, vendor, contractor, or franchisee as to the Quincy and Wellesley sushi bars. Neither did he operate or work at either of these.

21. After some negotiation Ghorbani agreed to purchase from Aung the rights Aung purported to hold to the Quincy and Wellesley sushi bars for a price of $100,000.00.

22. Ghorbani reduced their agreement to a writing, a one-page document entitled "Sales Contract" that was introduced as Plaintiff's Exhibit 2 at trial ("the Sales Contract"). True to its title, the Sales Contract clearly contemplates a sale of rights, not an agreement by Aung to act as a broker for Ghorbani. The Sales Contract begins by identifying Atlantic Trade as buyer and Aung as seller and promptly declaring "The seller is selling his %100 interest [sic] in 2 sushi counter locations to the buyer […] for amount of $100,000.00." It identifies the Wellesley and Quincy Roche Brothers Supermarkets as the locations of the sushi bars in question. After reciting some other terms, it has signature lines for "Buyer: Atlantic Trade LLP: by Mohsen Ghorbani," "Seller: Mr. Zaw Moe Aung," and "Witness: Gelare Maali."

7

23. The Sales Contract was signed by each of these named signatories on December 9, 2010.

24. By signing in his purported capacity as "seller," Aung both falsely represented and created and furthered the false pretense that he owned rights to the Wellesley and Quincy sushi bars.

25. Aung knew this representation and pretense to be false when he signed the Sales Contract in his purported capacity as seller. He made the false representation and created the false pretense with intent to induce Ghorbani, as a principal of Atlantic Trade, to rely on them by paying him $100,000 for the rights he purported to be selling.

26. In signing the Sales Contract, Ghorbani understood that he was agreeing to purchase rights to operate the Wellesley and Quincy sushi bars that belonged to Aung, and that, although he would also need for Hissho to acknowledge Atlantic Trade LLP as the new owner/vendor/contractor, he needed to purchase Aung's right to operate these sushi bars in order to become their new operator.

27. The Sales Contract specified the timing for Aung's payment of the $100,000 purchase price. First, "the buyer will pay the seller the amount of $5000.00 on or before 12/13/2010 as a deposit." Second, the buyer will pay the seller "$70,000 on 12/20/2010 or after the contract has been drafted and assigned by Hissho Company Management the Direct Representative of Roche Brothers Supermarket Inc acknowledging Atlantic Trade LLP as the new owner/vendor/contractor for the above stores." Third, the balance of $25,000 will be paid in five monthly installment of $5,000 each, due on first days of February, March, April, May, and June, 2011.

28. Ghorbani and his wife did not have sufficient funds to make the first two payments, so Ghorbani prevailed upon his wife's parents, in Iran, to loan him $65,000 to enable him to make the payments. This, however, took time to arrange.

29. In the meantime, on December 17, 2010, Ghorbani made two payments to Aung, both made payable, at Aung's instruction, to Trade North USA Company. The first, by check number 1022, was in the amount of $10,000; and the second, by check number 1023, was in the amount of $65,000.

In exchange for these checks, Aung signed a document entitled "Paymnet (sic) Receipt," which was drafted by Ghorbani and stated: "I, Zaw Moe Aung owner of Trade North USA Company on this 17th day of December 2020, I am receiving the following checks as payments, Check number 1022 in the amount of $10,000 for 1st payments, And, Check number 1023 in the amount of $65,000 as 2nd payments, From Mr. Mark Mohsen Ghorbani/Atlantic Trade LLP for down payments on the sale contract date 12/09/2010 For the sale of the Wellesley and Quincy sushi counters. The remaining balance of $25,000 to be paid as it was agreed." This receipt was signed by Aung and Ghorbani.

30. In arranging for these payments, Aung told Ghorbani, and Ghorbani therefore understood, that Aung was the owner of Trade North USA Company, the entity to whom Aung instructed that the payment checks should be made out. In fact, unbeknownst to Ghorbani, Trade North USA Company was the name of a retail sushi business of which Caroline was the owner.

31. Aung deposited the $10,000 check of December 17, 2010 that Ghorbani had given him.

32. Ghorbani testified, and I find, that he gave the $65,000 check of December 17, 2010, to Aung as an act of good faith, and that he and Aung agreed that Aung would simply hold that check (not deposit it) for a time until Ghorbani could arrange to receive the $65,000 he was borrowing from his wife's parents. Aung did hold the $65,000 check and never deposited or cashed it.

33. Ghorbani succeeded in borrowing $65,000 from his wife's parents, but international banking restrictions prevented that money from being wired to him in the United States from Iran. Instead, Ghorbani had the monies wired to an account in Dubai in the United Arab Emirates. Aung instructed Ghorbani that he could effect the payment of the $65,000 by releasing the monies in Dubai to two individuals named by Aung, whom Aung indicated he would send to pick up the funds on Aung's behalf. This agreement was reflected in a further document, drafted by Ghorbani and dated December 29, 2010, that stated: "As to the sale agreement dated 12/09/2010 between Atlantic trade llp and it's representative Mr. Mohsen Ghorbani, the buyer and Trade North usa llc and it's primary principal Mr.

9

Zaw Noe (sic) Aung, the seller, Mr. Zaw M. Aung has instructed the buyer to release the partial payment of purchase price in the amount of $65,000.00 to be release to: Mr. Usman Musmatar . . . and Mr. Khin Maung Than . . . .  After the above amount has been release on or before 01/03/2011 to the above parties, Mr. Zaw M. Aung shall return the check #1023 from Sovereign Bank in the amount of $65000.00 dated 12/22/2010 to Mr. Ghorbani."  This document was signed by Aung on 12/29/2010, by Ghorbani, and also by Mr. Ray Amouzandeh as a witness.

        34.       Aung seeks findings that he did not tell Ghorbani to wire $65,000 to his cousins in Dubai, that he does not have cousins in Dubai, that he has never travelled to Dubai, and the he did not receive $65,000.00 from Ghorbani. I reject these findings. It is Aung who dictated to Ghorbani the payment arrangements for the $65,000.00 payment and specified the individuals to whom the payment was to be released. Their precise relation to Aung—whether cousins, brothers, friends, or other—is irrelevant. The monies were in fact released to one or the other of these individuals, or perhaps both, as contemplated by the parties' writing of 12/29/2010. And, at trial, Aung testified that, in early January 2011, he threatened to sue Ghorbani if he did not effect the payment in Dubai within a day.  Aung further testified that he made this threat because he was "the middle man"—he didn't explain what he meant by this.  It is clear, however, that the monies were paid, that the recipients were Aung's nominees, and that the monies were paid as the purchase price due to Aung under the Sales Contract. Ghorbani did not know the individuals in question and had no other relationship to them. I do not find that Aung himself ever received the monies transferred in Dubai. (Aung denies that he did; I do not find his testimony credible, but I have no other evidence on the issue and therefore make no finding one way or the other.) I *do* find that the monies were transferred to one or the other, or perhaps both, of the individuals whom Aung had nominated as his payees, and the payment to them was in effect the payment to Aung of $65,000 of the purchase price.

35. After the $65,000.00 payment was made in Dubai, Aung returned to Ghorbani the $65,000 check that Ghorbani had given him as a good faith gesture.

36. By virtue of the initial check for $10,000 and the later transfer of $65,000 in Dubai, Ghorbani paid a total of $75,000.00 to Aung or to his order under the Sales Contract, ostensibly for purchase of the Wellesley and Quincy sushi bars (but in fact for nothing, as Aung had no rights to sell). Ghorbani never made a further payment on the Sales Contract; he made none of the five $5,000 installment payments it contemplated.

37. In December 2010 and January 2011, Atlantic Trade LLP, Ghorbani, and Caroline (collectively as "Contractor") entered into an agreement entitled Independent Contractor Agreement, and an amendment thereto, with Hissho Sushi for Contractor's operation of the sushi bars in the Roche Brothers stores in Mashpee, Quincy, and Wellesley. The contract was to be of a year's duration, commencing November 28, 2010, and subject to possible extension. Pursuant to the contract, Atlantic Trade, through Caroline as "operating partner," took over operation of the sushi bars at the stores in Mashpee, Quincy, and Wellesley.

38. On April 5, 2011, Hissho issued a "warning notice" to Ghorbani, Caroline, and Atlantic Trade, citing "poor management of sushi bar," "violation of Operation Manual/Sushi Bar Profile, " and "violation of Independent Contractor Agreement," based on an incident of that date at the Wellesley store. This warning notice was designated a final warning.

39. On June 30, 2011, Hissho send to Ghorbani and Atlantic Trade a notice that it was exercising its contractual right to terminate their Independent Contractor Agreement, effective August 6, 2011, citing "egregious violations of your Independent Contractor Agreement."

40. In May 2013, Ghorbani and Atlantic Trade sued Caroline and Aung in state court. Four of the complaint's ten counts sought relief against Aung: Count VII for breach of contract, specifically failure to sell the sushi franchises that Atlantic Trade had purchased; Count VIII for unjust

11

enrichment/monies had and received, for receipt of monies and failure to perform the obligations for which the monies were advanced; Count IX, for fraud/misrepresentation; and Count X, for breach of duties of good faith and fair dealing.

41. In September, 2014, judgment entered by default against Aung and in favor of both Atlantic Trade and Ghorbani in the principal amount of $90,000, plus prejudgment interest of $13,906.97 and costs of $125.80. It is this judgment debt that is the subject of this adversary proceeding. The principal amount of the judgment, $90,000.00, is plainly compensation for the money that Ghorbani paid Aung under the first and second agreements, which monies totaled $90,000: $15,000 under the first agreement, and $75,000 under the second. The judgment, including the prejudgment interest and costs components, and any postjudgment interest that accrues on it, is in its entirety a debt for the monies that Aung obtained (for himself and/or his nominees) through the first and second agreements and the misrepresentations and false pretenses he made to induce the Plaintiffs to enter into each.

42. On March 6, 2018, Aung then filed the petition for relief under Chapter 13 of the Bankruptcy Code that commenced the bankruptcy case in which this adversary proceeding arises.

**JURISDICTION**

The matter before the court is a complaint under 11 U.S.C. § 523(a) to determine the dischargeability of a debt. The matter arises under the Bankruptcy Code and in a bankruptcy case and therefore falls within the jurisdiction given the district court in 28 U.S.C. § 1334(b) and, by standing order of reference, referred to the bankruptcy court pursuant to 28 U.S.C. § 157(a). It is a core proceeding. 28 U.S.C. § 157(b)(2)(I)(core proceedings include determinations as to the dischargeability of particular debts). This court accordingly has authority to enter final judgment in the matter. 28 U.S.C. § 157(b)(1).

**DISCUSSION**

    a. **Applicable Law**

As noted above, the only remaining count in this proceeding is the Plaintiffs' assertion that their judgment against Aung is nondischargeable under 11 U.S.C. § 523(a)(2)(A). Under that section a "discharge under . . . this title does not discharge an individual debtor from any debt — for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by— (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." The Plaintiffs invoke all three parts of § 523(a)(2)(A)—false pretenses, false representations, and actual fraud—but in substance they base their case entirely on false pretenses and false representations. They allege no "actual fraud" in which the fraud does not consist entirely of false representations and false pretenses within the meaning of this subsection. I therefore limit my analysis accordingly.

The First Circuit applies a six-part test for establishing non-dischargeability under § 523(a)(2)(A), the so-called *Palmacci* test:

> in order to establish that a debt is nondischargeable because obtained by "false pretenses, a false representation, or actual fraud," we have held that a creditor must show that 1) the debtor made a knowingly false representation or one made in reckless disregard of the truth, 2) the debtor intended to deceive, 3) the debtor intended to induce the creditor to rely upon the false statement, 4) the creditor actually relied upon the misrepresentation, 5) the creditor's reliance was justifiable, and 6) the reliance upon the false statement caused damage.

*McCrory v. Spigel (In re Spigel)*, 260 F.3d 27, 32 (1st Cir. 2001) (citing *Palmacci v. Umpierrez*, 121 F.3d 781, 786 (1st Cir. 1997)). A party seeking to except a debt from discharge bears the burden of proving each element by a preponderance of evidence. *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

Intent to deceive refers to the Debtor's mental state and specifically requires a mental state embracing an intent to deceive, manipulate, or defraud. *Palmacci*, 121 F.3d at 786-87, citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1380–81, 47 L.Ed.2d 668 (1976). "Availability of

13

direct evidence to prove a debtor's intent to deceive a creditor is unlikely to be obtained. The court, therefore, may infer fraudulent intent from the totality of circumstances." *Danvers Savings Bank v. Alexander (In re Alexander)*, 427 B.R. 183, 195 (Bankr. D. Mass. 2010), citing *Palmacci*, 121 F.3d at 789.

The final four elements embody the requirement that the creditor's claim must arise directly from the debtor's fraud. *McCrory*, 260 F.3d at 32. As to the creditor's reliance, the Supreme Court of the United States has held that § 523(a)(2)(A) requires only justifiable reliance—a lower standard than reasonableness. *Field v. Mans,* 516 U.S. 59, 70 (1995). Reliance is justifiable if the falsity of the representation would not have been readily apparent to the person to whom it was made. *Id.* at 70-72. Under the justifiable reliance standard, "a person is justified in relying on a representation of fact 'although he might have ascertained the falsity of the representation had he made an investigation.'" *Id.*, quoting Restatement (Second) of Torts § 540. For purposes of determining whether reliance was justified, "the circumstances of the reliance claim must be taken into account," and "the individual is not obliged to investigate statements made to him (although he cannot shut his eyes to an obvious falsehood)." *Lentz v. Spadoni* (*In re Spadoni*), 316 F.3d 56, 59 (1st Cir. 2003).

The requirements for establishing that money was obtained by false pretenses under § 523(a)(2)(A) differ in a limited respect:

> Where the exception is based on false pretenses, the requirements are largely the same, except that the requirement of a false representation is replaced by a requirement of a false pretense, which is an implied misrepresentation or a false impression created by conduct of the debtor. [*Merchants National Bank of Winona v. Moen (In re Moen)*, 238 B.R. 785, 791 (8th Cir. BAP 1999)]; *SunTrust Bank v. Brandon (In re Brandon)*, 297 B.R. 308, 313 (Bankr. S.D. Ga. 2002) (as distinguished from false representation, which is an express misrepresentation, false pretense involves an implied misrepresentation or conduct intended to create and foster a false impression); *H.C. Prange Company v. Schnore (Matter of Schnore)*, 13 B.R. 249, 251–252 (Bankr. W.D. Wis. 1981) (same). Silence— that is, the failure to disclose something that one was obligated to disclose—can form the basis of a finding of false pretense. *Moen,* 238 B.R. at 791 and cases cited; *Drake Capital Securities v. Larkin (In re Larkin)*, 189 B.R. 234, 239 (Bankr. D. Mass. 1995). The duty to disclose can be created by the false pretense itself.

14

> [W]hen the circumstances imply a particular set of facts, and
> one party knows the facts to be otherwise, that party may
> have a duty to correct what would otherwise be a false
> impression. This is the basis of the "false pretenses" provision
> of Section 523(a)(2)(A).
>
> *Moen*, 238 B.R. at 791 (citations and internal quotations omitted). If the
> disclosure is needed to avert the creation of a false pretense, a known
> misunderstanding, the disclosure becomes obligatory. Still, as is implicit in
> the requirement of fraudulent intent, the false pretense must be
> deliberately fostered and not merely the result of inadvertence. *In re
> Grenier*, 2009 WL 763352, *10 (Bankr. D. Mass. 2009).

*In re Levasseur*, 482 B.R. 15, 29 (Bankr. D. Mass. 2012), *aff'd*, 2013 WL 2436688 (D. Mass. June 3, 2013), *aff'd*, 737 F.3d 814 (1st Cir. 2013).

    **b. The First Transaction**

Here, the Plaintiffs seek a determination of false representation and false pretenses for advances on two distinct transactions: the $15,000 advanced on the first contract, for purchase of the Mashpee sushi bar, and then the $75,000 advanced on the second, for purchase of the Quincy and Wellesley sushi bars. I begin with the former.

The first transaction was Ghorbani's agreement with Aung for the purchase and sale of an interest that Aung represented to Ghorbani that he owned in the sushi bar at the Roche Brothers supermarket in Mashpee for payments totaling $15,000. I have found that, in conjunction with that transaction; (i) Aung represented to Ghorbani (a) that he owned an interest in the Mashpee sushi bar and (b) in promising to convey such interest to Ghorbani, that he intended to convey that interest to Ghorbani; (ii) that these representations were false, as Aung owned no interest in that sushi bar and could not have and did not intend to convey any such interest; (iii) that Aung knew that, by virtue of false representations made to Ghorbani by Caroline and bolstered by Aung's own false representations to Ghorbani, Ghorbani was proceeding under the false pretense that Aung owned an interest in the Mashpee sushi bar, and could convey the same, but Aung made no attempt to disabuse Ghorbani of this false pretense; (iv) that Aung knew his representations and the pretense that he owned an interest in

15

the Mashpee sushi bar to be false when he made the representation and proceeded on the false pretense; (v) that Aung made the false representation and fostered the false pretense with intent to induce Ghorbani, for himself and Atlantic Trade, to rely upon them by purchasing Aung's fictitious interest in the Mashpee sushi bar for payments to Aung totaling $15,000; (vi) that Ghorbani, for himself and Atlantic Trade, did actually rely on the false representation and false pretense that Aung owned an interest in the Mashpee sushi bar, and intended to convey the same, by paying to Aung, or his nominee, the sum of $15,000 to purchase Aung's fictitious interest in the Mashpee sushi bar; (vii) that Ghorbani's reliance was justifiable in that he was aware of nothing that might have put him on notice that the representations and pretense were false; (viii) that Ghorbani and Atlantic Trade were injured by such reliance in that they advanced $15,000 to Aung, or his nominee, for nothing, because Aung, having no interest in the Mashpee sushi bar, had nothing to give Ghorbani and Atlantic Trade, and could not and did not transfer to him the agreed consideration for the payments; and (ix) that the resulting judgment debt, to the extent of $15,000 of the principal amount of the judgment, plus pro rata shares of the interest and costs portion of the judgment and any postjudgment interest, is a debt for this $15,000 obtained by false representations and false pretenses within the mearing of § 523(a)(2)(A). For these reasons, I conclude that the Plaintiffs have established by a preponderance of the evidence each of the necessary elements of § 523(a)(2)(A), under each of the false representation and false pretense prongs thereof, for exception of the resulting judgment debt from discharge.

    **c. The Second Transaction**

The second transaction was Ghorbani's agreement with Aung for the purchase and sale of an interests that Aung represented to Ghorbani that he owned in the sushi bars at the Roche Brothers supermarkets in Quincy and Wellesley for payments totaling $100,000. I have found that, in conjunction with that transaction, (i) Aung represented to Ghorbani (a) that he owned interests in the Quincy and Wellesley sushi bars and (b) by his contractual promise to convey the same, that he intended to convey

16

such interest to Ghorbani; (ii) that these representations were false, as Aung owned no interest in either sushi bar and could not convey such an interest; (iii) that Aung knew his representation that he owned interests in the Quincy and Wellesley sushi bars to be false when he made it; (iv) that Aung made the false representation with intent to induce Ghorbani, for himself and Atlantic Trade, to rely upon them by purchasing Aung's fictitious interest in the Quincy and Wellesley sushi bars for payments to Aung totaling $100,000; (vi) that Ghorbani, for himself and Atlantic Trade, did actually rely on the false representation that Aung owned interests in the Quincy and Wellesley sushi bars by paying to Aung, or his nominee, the sum of $75,000 to purchase Aung's fictitious interest in the Quincy and Wellesley sushi bars; (vii) that Ghorbani's reliance was justifiable in that he was aware of nothing that might have put him on notice that the representation was false; (viii) that Ghorbani and Atlantic Trade were injured by such reliance in that they advanced $75,000 to Aung, or his nominees, for nothing, because Aung, having no interest in the Quincy and Wellesley sushi bars, had nothing to give Ghorbani and Atlantic Trade, and could not and did not transfer to him the agreed consideration for the payments; and (ix) that the resulting judgment debt, to the extent of $75,000 of the principal amount of the judgment, plus pro rata shares of the interest and costs portion of the judgment, plus postjudgment interest, is a debt for this $75,000 obtained by false representations and false pretenses within the mearing of § 523(a)(2)(A).  For these reasons, I conclude that the Plaintiffs have established by a preponderance of the evidence each of the necessary elements of § 523(a)(2)(A), under the false representation prong thereof, for exception of the resulting judgment debt from discharge.

**CONCLUSION**

For the reasons set forth above, the court will, by entry of a separate judgment, declare the judgment debt in its entirety excepted from discharge.

Date:  January 31, 2020

_____
Frank J. Bailey
United States Bankruptcy Judge

17